IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

DUDLEY FLYING SERVICE, INC.                                           PLAINTIFF

v.                              Case No. 3:13-cv-00156-KGB

AG AIR MAINTENANCE SERVICES, INC.                                     DEFENDANT

## OPINION AND ORDER

Plaintiff Dudley Flying Service, Inc. ("Dudley"), brings this action against defendant Ag
Air Maintenance Services, Inc. ("Ag Air"), alleging claims of negligence *per se* and negligence;
violations of the Arkansas Deceptive Trade Practices Act ("ADTPA"), Ark. Code Ann. § 4-88-
107; and a claim for punitive damages (Dkt. No. 26). Before the Court is Dudley's motion for
partial summary judgment (Dkt. No. 36). Ag Air has responded in opposition (Dkt. No. 39), and
Dudley has replied (Dkt. No. 42). For the reasons that follow, the Court denies Dudley's motion
for partial summary judgment (Dkt. No. 36).

### I.      Factual Background

Dudley is an agricultural aviation company, commonly known as a "cropduster," and
operates an Air Tractor model AT802A aircraft. Between November 2006 and August 2010, Ag
Air maintained Dudley's aircraft and its engine. On August 10, 2010, Dudley's aircraft
experienced an engine failure on takeoff roll. The pilot—Dudley's owner, Bruce Benthien—was
able to maintain control of the aircraft and was not injured, but the engine was severely damaged.
A post-accident investigation conducted by the engine's manufacture, Pratt & Whitney Canada
("PWC"), determined that the engine failure was caused by a fracture of a second-stage power
turbine blade ("PT blade") inside the engine labeled as blade number 26 and the fracturing of
other PT blades secondary to the fracture of PT blade number 26. Dudley asserts that Ag Air

failed to inspect the engine's PT blades in accordance with the PWC Maintenance Manual and Federal Aviation Administration ("FAA") requirements.

The PWC Maintenance Manual applicable to this model engine, model PT6A-67AG, includes a table of periodic inspections that requires, among other things, that the PT blades be inspected every 200 hours of operation after the PT blades reach 4,000 hours of operating time (Dkt. No. 37-18, at 7-8). The parties agree that these provisions of the PWC Maintenance Manual were applicable to Dudley's engine and that the purpose of the PT blade inspection is to check for evidence of cracking and for loss of material in the blade tip (Dkt. No. 37-5).

According to Dudley and the PWC Investigation Report, the engine and its PT blades had a total operational time of 4,955 hours at the time of the engine failure, beyond the 4,000 hour threshold triggering the requirement that the PT blades be inspected after every 200 hours of operation. Ag Air contends that the amount of hours on the engine at the time of the engine failure is unknown, citing the testimony of Ag Air's owner, Steve Brewer, accusing Mr. Benthien of disconnecting the Hobbs meter—a device that measures an aircraft's hours of operation—on Dudley's aircraft on one or more occasions (Dkt. No. 41-1).

Ag Air performed multiple 100-hour inspections after the engine had over 4,000 hours and, prior to the engine failure, last inspected the engine on July 22, 2010, at 4,906 hours. Ag Air admits it never performed an inspection of the PT blades. It is undisputed that Ag Air's mechanics performed maintenance on Dudley's aircraft by following a checklist for 100-hour inspections that Mr. Brewer developed. Mr. Brewer testified that he decided what to put in the checklist "mainly from the [PWC] Maintenance Manual and some of it just from experience, past experience on the 100-hour inspections." (Dkt. No. 37-6, at 6). Mr. Brewer testified that

the 200-hour PT blade inspections were not performed because he and his mechanics were not aware of the required inspection (*Id.* at 15-16).

Mr. Brewer testified that he first became aware of the required 200-hour PT blade inspections through a service bulletin but later learned that that required 200-hour PT blade inspections were called for by the PWC Maintenance Manual for the Dudley engine at the time of the August 2010 engine failure.  Mr. Brewer agreed that, when Ag Air performs maintenance, Ag Air is required to use the methods, techniques, and practices in the current manufacturer's maintenance manual.  Mr. Brewer stated that in 2010 Ag Air had a current copy of the PWC Maintenance Manual for the Dudley model engine, and he agreed that, since Ag Air was required to look at the manual, there is no excuse for Ag Air not performing the 200-hour PT blade inspection (Dkt. No. 37-6, at 14-15).  In addition, one of Ag Air's experts, James Irvin, agreed that Ag Air should have pulled out and looked through the manufacturer's inspection checklist every time Ag Air did a 100-hour inspection (Dkt. No. 37-11, at 19-20).  Mr. Brewer testified that he had no idea how long this requirement had been in the PWC manual at the time of the engine failure (Dkt. No. 37-6, at 15).  One of Dudley's experts, Lee Coffman, testified that he had a manual from 2002 that included Table 601, the periodic inspection schedule containing the 200-hour PT blade inspection requirement (Dkt. No. 37-17, at 2-3).

At some point in this litigation, in response to Dudley's requests for admission, Ag Air took the position that it was not contracted to perform a power turbine inspection (Dkt. No. 37-5).  However, Ag Air does not develop this argument in its summary judgment papers.

Dudley contends that Ag Air made misrepresentations that it was conducting maintenance on Dudley's engine in accordance with the PWC Maintenance Manual.  Ag Air admits that it made log book entries indicating the completion of a 100-hour inspection in

accordance with the engine's maintenance manual.  Dudley has included in the record copies of various log book entries signed by Mr. Brewer and stating in part that Ag Air performed its inspection and work either:  "IAW [in accordance with] P&W Maintenance Manual," "in accordance with the PT64-67AG Maintenance Manual," "in accordance with a 100 hour inspection," or "in accordance with an annual inspection."  (*See* Dkt. No. 37-7).

Dudley further contends that Ag Air violated certain FAA regulations by not following the PWC Maintenance Manual, *see* 14 C.F.R. § 43.13, and not demonstrating a knowledge of the current instructions of the manufacturer, *see* 14 C.F.R. § 65.81.  Dudley also contends that Ag Air violated 14 C.F.R. §§ 43.5, 43.9 and 43.11, pertaining to certain requirements for maintenance record entries, based on Dudley's assertion that Mr. Brewer and Ag Air have admitted to not making log book entries for some 100-hour inspections that were performed. However, there is some disputed testimony as to whether the log books were always in Ag Air's possession or whether Dudley's owner, Mr. Benthien, could be at fault for there being some missing entries.

The parties dispute causation and whether the failed inspections of the PT blades would have prevented the engine failure.  As stated above, PWC determined that the engine failure was caused by the fracture of PT blade number 26 that then caused fractures to other PT blades. PWC's Investigation Report states that 12 of the 43 second-stage PT blades in Dudley's engine had developed fatigue cracks at some point prior to the engine failure on August 10, 2010.  The parties dispute whether Ag Air would have discovered any fatigue cracks in the PT blades had it performed the 200-hour PT blade inspections in accordance with the PWC Maintenance Manual. Both parties have presented competing expert opinions regarding the length of time it took the

crack to develop and whether any fatigue cracks would have been visible and detectable during one of the 200-hour PT blade inspections, had such inspections been performed.

Dudley seeks compensatory damages in the amount $805,638.52. Dudley also seeks punitive damages in an amount to be determined by the jury. Ag Air maintains Dudley is not entitled to recover any damages. If Dudley proves it is entitled to recover damages, however, Ag Air disputes the amount of damages Dudley claims and whether Dudley is entitled to punitive damages.

## II.     Discussion

Dudley moves for summary judgment on liability, its amount of compensatory damages, and its entitlement to punitive damages. Ag Air opposes Dudley's motion on all issues. Dudley, in a footnote in its reply, asks that the Court disregard as untimely Ag Air's response to Dudley's motion. Dudley contends that Ag Air filed its response two days late. Dudley has made no argument of prejudice. Dudley filed a reply addressing points raised in Ag Air's response. The Court will consider Ag Air's response.

In its summary judgment papers, Dudley challenges the admissibility of the testimony of Ag Air's metallurgist expert, Dr. Arun Kumar, arguing that Dr. Kumar's testimony does not meet the requirements for admissibility set forth in Federal Rule of Evidence 702. Dudley argues that, without Dr. Kumar's testimony, Ag Air has no evidence to show a triable fact issue as to causation.

Because Dudley argues in its motion for partial summary judgment that Ag Air has no evidence to refute causation and because Ag Air intends to rely on Dr. Kumar's testimony as such evidence, the Court will determine the admissibility of Dr. Kumar's testimony prior to resolving Dudley's motion for partial summary judgment. *See, e.g.*, *Smith v. Bubank*, 643 F.3d

1137, 1142 (8th Cir. 2011) (upholding district court's determination that a doctor's anticipated testimony failed to demonstrate that defendant caused plaintiff's injury and, thus, was inadmissible under Rule 702; therefore, the entry of summary judgment in favor of defendant was appropriate); *Morgan v. United Parcel Serv. of Am., Inc.*, 380 F.3d 459, 467 (8th Cir. 2004) ("Because the only evidence that substantiates Plaintiffs' claim is their regression analyses, and because this sort of evidence is subject to *Daubert*, two issues arise:  (1) admissibility and (2) the propriety of summary judgment.  If the analyses were not admissible, then summary judgment was appropriate.  If the analyses were admissible, summary judgment may or may not be appropriate . . . .").

### III.     Admissibility of Dr. Kumar's Anticipated Testimony

Dr. Kumar is a metallurgist and Vice President of SEAL Laboratories.  According to his *curriculum vitae*, Dr. Kumar has "[e]xtensive experience in metallurgical failure analysis of aircraft, helicopter, automobile and motorcycle components, machineries, medical implants, machine tools and household appliances."  (Dkt. No. 40-1).  Both parties submitted for the Court's review Dr. Kumar's four-page report (Dkt. Nos. 37-14, 40-2), but neither party included in the record evidence what Ag Air represents are 83-pages of attachments to the report (Dkt. No. 40, at 1).

Dr. Kumar's report opines in part that PT blade number 26 failed due to "high cycle low stress fatigue" and that short fatigue crack propagation times prevented the fatigue cracks from being discovered during prior inspection.  Dudley challenges Dr. Kumar's conclusions and calculations as to fatigue crack propagation time.  Dr. Kumar's report specifically states in conclusion number 3:

> Since the fatigue crack nucleation times are extremely long and the fatigue crack
> propagation times are extremely short due to high RPM of the turbine, the fatigue

cracks propagated in a matter of minutes. Such short fatigue crack propagation times do not allow these cracks to be discovered during prior inspection since the blade surface shows no indications while the fatigue cracks are nucleating under a low stress condition.

(Dkt. No. 37-14, at 4).

According to Dr. Kumar's report, he determined fatigue crack propagation time by first measuring striation spacing for areas of the blade using high magnification, scanning electron microscope ("SEM") micrographs. After listing the approximate striation spacing measurements for certain areas of the fracture surface, Dr. Kumar's report states:

These data indicate that in .01 inch crack length (approximate blade thickness in center), the maximum number of fatigue cycles will be 10,204. Since the RPM of this turbine is 29,894, it can easily be seen that the fatigue crack propagation time is in the range of 0.34 minutes. Even if these calculations are way off, the fatigue crack propagation time cannot exceed a few minutes.

(Dkt. No. 37-14, at 3).

Dudley essentially challenges Dr. Kumar's math, arguing that Dr. Kumar incorrectly assumes that each revolution of the turbine counts as a cycle of the engine. Dudley asks that the Court exclude Dr. Kumar's anticipated testimony under Rule 702.

"Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony. The rule clearly is one of admissibility rather than exclusion." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (internal quotations and citations omitted). "The exclusion of an expert's opinion is proper only if it is so fundamentally unsupported that it can offer no assistance to the jury." *Wood v. Minn. Mining & Mfg. Co.*, 112 F.3d 306, 309 (8th Cir. 1997) (internal quotations and citations omitted).

Rule 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In determining whether expert testimony should be admitted, the district court must decide if the expert's testimony and methodology are reliable, relevant, and can be applied reasonably to the facts of the case.  *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012); *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010).  Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the district court must conduct this initial inquiry as part of its gatekeeping function.  *Watson*, 668 F.3d at 1015. *Daubert* is meant to protect juries from uncertain scientific testimony.  *Id.*

To satisfy the reliability requirement for admission of expert testimony, the party offering the expert testimony must show by a preponderance of the evidence that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid. *Barrett*, 606 F.3d at 980 (internal quotation marks and citation omitted).  To satisfy the relevance requirement for the admission of expert testimony, the proponent must show that the expert's reasoning or methodology was applied properly to the facts at issue.  *Id.*

The Court examines the following four non-exclusive factors when determining the reliability of an expert's opinion:  (1) "whether it can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) "[the method's] 'general acceptance.'"  *Presley v. Lakewood Eng'g and Mfg. Co.*, 553 F.3d 638, 643 (8th Cir. 2009) (quoting *Daubert*, 509 U.S. at 593-94).

8

These factors are not exhaustive or limiting, and the Court must use the factors as it deems fit to tailor an examination of the reliability of expert testimony to the facts of each case. *Id.* In addition, the Court can weigh whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case. *Id.* While weighing these factors, the Court must continue to function as a gatekeeper who separates expert opinion evidence based on good grounds from subjective speculation that masquerades as scientific knowledge. *Id.* Thus, speculative expert testimony with no basis in the evidence is inadmissible. *Weisgram v. Marley Co.*, 169 F.3d 514, 518-19 (8th Cir. 1999), *aff'd*, 528 U.S. 440 (2000) (reversing a district court for allowing a witness who was qualified as a fire investigator "to speculate before the jury as to the cause of the fire by relying on inferences that have absolutely no record support").

Applying these standards, Dr. Kumar's report provides in detail his methodology for examining the blade visually and for elemental composition, measuring striation spacing, and calculating fatigue crack propagation time. Dudley essentially challenges only the math in the fatigue crack propagation calculation, arguing that Dr. Kumar incorrectly assumes that each revolution of the turbine counts as a cycle of the engine. Dudley contends that a "cycle" means an engine start or stop based on the testimony of Ag Air's first expert, Mr. Irvin, and based on literature from PWC. As to Mr. Irvin, it is not clear that the testimony Dudley cites directly contradicts Dr. Kumar's opinions and calculations. Further, during the line of questioning Dudley cites, Mr. Irvin, who is not a metallurgist, agreed that some of the issues being discussed entailed matters of metallurgy, and he also testified that a metallurgist needed to look at the fracture surface of the failed PT blade (Dkt. No. 37-11, at 12-13, 16, 26-27).

As to the PWC literature, Dudley cites a PWC service bulletin that provides a formula for calculating cycles and abbreviated cycles for purposes of determining the service life limits of specific rotor component parts (Dkt. No. 37-22). Dudley also points to the first page of the PWC Investigation Report, which states that the engine had a cycle count of 4,018 (Dkt. No. 37-8, at 1). That is the only mention of a cycle count in the report, and the report does not elaborate on how cycles were counted or the significance of the cycle count. Dudley has not convinced this Court that PWC's method of counting cycles renders Dr. Kumar's calculations inappropriate or fundamentally unreliable. Dudley may cross examine Dr. Kumar on these issues, but based on the record before the Court at this time, the Court determines that Dr. Kumar's anticipated testimony, including his opinions on fatigue crack propagation times, is admissible.

For these reasons, the Court determines that Ag Air has met its burden to demonstrate the admissibility under Rule 702 of Dr. Kumar's anticipated testimony, and the Court denies Dudley's request to exclude Dr. Kumar's testimony.

## IV.     Motion for Partial Summary Judgment

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989). However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th

Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

As discussed above, Dudley moves for summary judgment on all of its claims and the amount of its compensatory damages, as well as its entitlement to punitive damages.  The Court will consider each in turn.

### A.      Claims of Negligence

To the extent Dudley asserts in its amended complaint a claim for negligence *per se* for Ag Air's alleged violation of FAA regulations, Dudley now correctly abandons that claim. "Under Arkansas law, the violation of a statute is only evidence of negligence and does not constitute negligence per se."  *Cent. Oklahoma Pipeline, Inc. v. Hawk Field Servs., LLC*, 400 S.W.3d 701, 712 (Ark. 2012) (citing *Shannon v. Wilson*, 947 S.W.2d 349 (Ark. 1997)); *see* Ark. Model Jury Instr., Civil AMI 601.  Dudley correctly states in its current briefing:  "Numerous regulations govern aircraft maintenance and a violation of one or more of these regulations, although not necessarily negligence, is evidence of negligence to be considered along with all of the other facts and circumstances in the case."  (Dkt. No. 37, at 18).

Relying in part on such evidence, Dudley continues to assert a negligence claim and requests partial summary judgment on this claim.  To establish a *prima facie* case of negligence under Arkansas law, Dudley has the burden of proving that (1) it has sustained damages, (2) Ag Air was negligent, and (3) Ag Air's negligence was a proximate cause of Dudley's damages.  *See*

*New Maumelle Harbor v. Rochelle*, 991 S.W.2d 552, 554 (Ark. 1999); Ark. Model Jury Instr.,

Civil AMI 302.  Negligence is "the failure to do something that a reasonably careful person

would do, or the doing of something that a reasonably careful person would not do, under the

circumstances."  *New Maumelle Habor*, 991 S.W.2d at 553-54 (citing *Wallace v. Broyles*, 961

S.W.2d 712 (Ark. 1998)).  Arkansas's three-element formulation of negligence combines the

first two of the four traditional elements of negligence, duty and breach, into the conclusory

element of negligence.  1 Howard W. Brill & Christian H. Brill, *Arkansas Law Of Damages* §

33:1 (6th ed. 2014).  The question of what duty, if any, is owed is a question of law, while the

determination of the satisfaction of a duty of care is a question for the jury.  *Catlett v. Stewart*,

804 S.W.2d 699, 702 (Ark. 1991); Brill & Brill, *supra*.

Dudley argues that Ag Air was negligent in failing to perform the 200-hour PT blade

inspections.  In response, Ag Air argues that Mr. Brewer mistakenly thought his checklist

complied with the PWC Maintenance Manual, although Mr. Brewer admitted there was no

excuse for not performing the 200-hour PT blade inspections.  Ag Air also attempts to lay some

blame on Dudley, claiming that Mr. Brewer will testify that the FAA regulations also make the

owner responsible for knowing about service bulletins that would advise of the 200-hour PT

blade inspection requirement.  In addition, Ag Air states in its briefing that there are issues of

fact in dispute as to whether the Hobbs meter was accurate because of indications that Mr.

Benthien purposely disconnected the Hobbs meter.  Further, Ag Air states in its pretrial

disclosures that it believes there are issues of fact in dispute regarding Ag Air's

recommendations to Dudley about overhauls and inspections and whether the PT blades would

have been replaced had the engine in fact been overhauled (Dkt. No. 45, ¶9).

Whether or not Ag Air breached a duty owed is ordinarily a question for the jury.  More importantly, however, the Court has determined that Dr. Kumar's testimony is admissible. Based on that ruling and the competing opinions of the experts as to whether conducting the 200-hour PT blade inspections would have prevented the engine failure and damage that occurred, there remain genuine issues of material fact in dispute as to proximate causation, an essential element of Dudley's negligence claim.  For these reasons, the Court denies Dudley's motion for partial summary judgment as to its negligence claim.

### B.    ADTPA

The ADPTA provides for a private right of action to any person "who suffers actual damage or injury as a result of an offense or violation" of the ADTPA.  Ark. Code Ann. § 4-88-113(f); *Skalla v. Canepari*, 430 S.W.3d 72, 82 (Ark. 2013).  The ADTPA prohibits a variety of listed practices or services.  *See* Ark. Code Ann. § 4-88-107.  In its briefing, Dudley specifically cites the prohibition on "[k]nowingly making a false representation as to the characteristics . . . or certification of goods or services . . . ."  *Id.*, § 4-88-107(a)(1).  "The elements of such a cause of action are (1) a deceptive consumer-oriented act or practice which is misleading in a material respect, and (2) injury resulting from such act."  *Skalla*, 430 S.W.3d at 82.  Further, "[a] private cause of action does not arise absent a showing of both a violation and resultant damages."  *Id.*

Dudley alleges in its first amended complaint that Ag Air violated the ADTPA by:  "(a) representing it inspected the Engine in accordance with the PWC Maintenance Manual when it did not;  (b) representing the Engine was airworthy when it was not; and (c) representing that it had complied with applicable Federal Aviation Regulations when it did not."  (Dkt. No. 26, ¶ 14).  These second and third allegations are redundant to the extent that they also are based on

the failure to perform the 200-hour PT blade inspections as called for in the PWC Maintenance Manual.

The parties dispute whether Ag Air "knowingly" misrepresented that it was following the PWC Maintenance Manual.  As stated above, Mr. Brewer essentially testified that he mistakenly thought his checklist was consistent with the PWC Maintenance Manual but had overlooked the 200-hour PT blade inspection requirement.  Dudley makes several arguments in an effort to show a knowing violation on the part of Ag Air.  Viewing the record evidence in the light most favorable to Ag Air, there are disputed issues of material fact regarding whether Ag Air knowingly made misrepresentations.  The Court also finds disputed issues of fact as to resultant damages because, for the reasons discussed above, causation is in dispute.

In its summary judgment papers, in support of its ADTPA claim, Dudley articulates two additional alleged misrepresentations that it did not identify in its complaint or amended complaint.  First, Dudley asserts that Mr. Brewer and Ag Air made a misrepresentation to Mr. Benthien and Dudley when, after the engine failure but pre-suit, Mr. Brewer told Mr. Benthien initially that the power turbine blade inspections were not mandatory, which apparently was based on Mr. Brewer's belief at the time that the requirement was stated in a service bulletin and not the PWC Maintenance Manual.  Second, Dudley contends that Ag Air made a misrepresentation in its discovery responses that it was not contracted to perform a power turbine inspection.  Even if the Court were to consider these arguments made for the first time at the summary judgment stage, Dudley fails to articulate how these alleged misrepresentations—both of which occurred after the engine failure—support a claim under the ADTPA.

For these reasons, the Court denies Dudley's motion for partial summary judgment as to its ADTPA claims.

### C.      Damages

Dudley also moves for summary judgment as to the amount of damages to which it contends it is entitled on its negligence and ADTPA claims.  As an initial matter, the Court finds a genuine issue of material fact in dispute regarding causation, and Dudley has not established on the record evidence before the Court that it is entitled to damages.  Further, based on the parties' briefing, the Court also finds disputed issues of fact as to the amount of damages Dudley claims. Ag Air has raised, among other issues, disputed issues of fact as to the value of the engine immediately before and after the incident and as to the value or ability to recover some of the particular components of Dudley's claims for loss of use damages.  *See* Ark. Code Ann. § 27-53-401 (defining the measure of damages in cases involving damage to motor vehicles); Ark. Model Jury Instr., Civil AMI 2210 (same).  The Court denies Dudley's motion for partial summary judgment as to the amount of damages.

### D.      Punitive Damages

Dudley also seeks a summary judgment determination that it is entitled to punitive damages pursuant to Arkansas Code Annotated § 16-55-206.  In order to recover punitive damages from Ag Air, Dudley has the burden of proving that Ag Air is liable for compensatory damages and that either or both of two aggravating factors were present and related to the injury for which compensatory damages are awarded.  In support of its claim for punitive damages, Dudley cites the first aggravating factor, which requires showing that a defendant "knew or ought to have known, in light of the surrounding circumstances, that his or her conduct would naturally and probably result in injury or damage and that he or she continued the conduct with malice or in reckless disregard of the consequences, from which malice may be inferred."  Ark. Code Ann. § 16-55-206(1).  "Before punitive damages may be allowed it must be shown that in

the absence of proof of malice or willfulness there was a wanton and conscious disregard for the rights and safety of others on the part of the tortfeasor." *Dalrymple v. Fields*, 633 S.W.2d 362, 363 (Ark. 1982). "Negligence alone is not sufficient to support an award of punitive damages." *Wallace v. Dustin*, 681 S.W.2d 375, 377 (Ark. 1984)

Dudley argues that Ag Air acted with such malice or in reckless disregard based on the alleged misrepresentations discussed above and based on Mr. Brewer's testimony acknowledging the potential danger to the lives of others that could result from a mistake on the part of Ag Air's mechanics. The Court denies Dudley's motion for partial summary judgment as to punitive damages. Because there is a factual dispute regarding causation, Dudley has not demonstrated that it is entitled to compensatory damages and, therefore, has not met its initial burden to support an award of punitive damages.

\*\*\*

For these reasons, the Court denies Dudley's motion for partial summary judgment in all respects (Dkt. No. 36).

SO ORDERED this the 8th day of April, 2015.

Kristine G. Baker
United States District Judge